STONE v. FEW et al. (No. 3468.)

Court of Civil Appeals of Texas. Texarkana.
Nov. 17, 1927.

1. **Appeal and error �köm 1062(2)—Where plaintiff did not perform acts entitling him to compensation for negotiating purchase, refusal to submit question of agency was harmless.**

In action for commissions for negotiating purchase of corporation stock, where it appeared that whether plaintiff was to act as agent of defendants or was to purchase stock for himself. and then sell property to defendants at profit, his right to compensation claim was contingent on his securing sale on terms stated, and jury found that he did not do so, refusal to submit question of plaintiff's agency was of no importance.

2. **Trial ⊙═⊃352(1)—Issue submitted on whether defendants had waived term on which plaintiff, suing for compensation. was to negotiate purchase, held not misleading.'**

In action for commissions for negotiating purchase of stock of lumber company at instance of defendants, where one of terms on which plaintiff was to secure sale was that defendants were to be allowed privilege of cutting oak timber for ties, and plaintiff claimed that defendants had agreed to have pine substituted for oak, issue submitted, "Did defendants waive provision in offer calling for oak timber?" held not misleading.

3. **Brokers ⊙═⊃49(3)—Plaintiff suing for commissions for negotiating purchase could not justify failure to protect defendants against tax claims as agreed by proving solvency of owners.**

Plaintiff, suing for commissions under agreement by which he was to negotiate purchase of stock of lumber company for defendants, could not justify his failure to warrant immunity to defendant from tax claims to date of transfer, as provided by contract with defendants, by proving well-known solvency of owners of property and their ability to pay all charges for which they might become responsible, since defendants had right to demand compliance with stipulations as written.

Appeal from District Court, Jasper County; V. H. Stark, Judge.

Action by O. M. Stone against A. A. Few and others. From a judgment for defendants, plaintiff appeals. Affirmed.

T. Stone and Hill & Hill, all of Houston, for appellant.

G. E. Richardson, of Jasper, Prendergast & Prendergast, of Marshall, and J. G. Woolworth and B. W. Baker, both of Carthage, for appellees.

HODGES, J. The appellant, O. M. Stone, sued the appellees, Ingham, Waterman, and Few to recover $250,000, which he claimed as commissions for negotiating for the purchase of the stock of the Alexander Gilmer Lumber Company at the instance of appellees. The case was tried before a jury on special issues, and a judgment was rendered against the appellant.

The admitted facts show that in 1920 the Alexander Gilmer Lumber Company, a private corporation, was engaged in the manufacture of lumber in East Texas. It owned several thousand acres of pine-timbered land in that portion of the state. It also owned two sawmill plants and other equipment used in the conduct of its business. The capital stock of the corporation was $100,000, divided into 1,000 shares, each of the par value of $100. A majority of the stock was owned and held by the estate and heirs of Alexander Gilmer and C. C. Gilmer, his wife, both of whom died before this controversy arose. The appellees Ingham, Waterman, and Few, were each interested in three different lumber manufacturing enterprises in East Texas. In September of 1920 they jointly began negotiations with Stone for the purchase of the entire property and interests of the Alexander Gilmer Lumber Company. They had a conference with Stone at Shreveport on October 30, 1920, which resulted in an agreement as to the terms upon which the appellees were willing to make the purchase. That agreement is embraced in the following letter, which was dictated by Stone after the conference:

"Shreveport, La., October 30, 1920.

"Mr. O. Stone, Jasper, Tex.—Dear Sir: Confirming our negotiations with reference to the purchase of the entire stock issue of the Alexander Gilmer Lumber Company.

"We will pay for the entire issue three million two hundred and fifty thousand dollars ($3,250,000.00), the stock at the time of the transfer to carry through with it the ownership of the physical properties of the company as submitted to you by inventory of date February 3rd, 1920, with the following adjustments from the inventory:

"(a) All timber cut since inventory or from the land upon which the timber estimates were made to be deducted at the rate of $9.00 per thousand feet.

"(b) The price of the lumber on hand to be $25.00 per thousand feet.

"(c) Fee simple title to two hundred acres at Remlig and one hundred acres at Jasper, covering the present mill sites with reservation to you of the mineral rights. We desire to lease additional acreage at Remlig at a nominal rental, during the life of the plant.

"(d) You are to warrant immunity from tax claims up to the date of the transfer of the property.

"(e) All cut-over timber adjacent to the mill site to be added to the timber inventory without charge.

"(f) We are to have fifteen years from removal of timber with reversion cutting clause.

"(g) Merchandise stocks to be reinventories.

"(h) All additions to equipment, live stock, machinery and supplies to be included in present inventory value.

"(i) We are to be allowed the privilege of cutting oak timber 12 inches for ties, measured at the top.

"Payments to be made as follows: One million ,on or before January 1, 1921, five hundred thousand dollars May 1, 1921.

"Deferred payments to be made in ten equal semi-annual payments bearing interest at the rate of 6% from date, both interest and principal sum payable semi-annually as it accrues, each successive six months after May 1, 1921; these deferred payments to be secured by mortgage liens upon the properties transferred. ·

"In case of destruction of the plant by fire an extension of payment for twelve months is requested.

"The property to be kept fully insured at our expense, both for the protection of the lien owners and for the purpose of replacing the plant if destroyed. It is understood that the insurance moneys will be used for replacement of the plant, and secondarily for protection of the owners of the lien.

"Before finally agreeing to take the properties as above stated, we shall desire to inspect the properties for approval of timber estimates and also determine whether we will be allowed to use the entire purchase price as invested capital for the purpose of making income tax returns. Time requested sixty days.

"Yours truly,          W. F. Ingham,
                              "W. M. Waterman.
                              "Allan A. Few."

Stone testified that this letter was a correct expression of the terms he was to submit to the stockholders of the Alexander Gilmer Lumber Company, except·the price to be paid; that he was to buy the stock for less than the amount stated in the letter; and his compensation was to be the difference between $3,250,000 and the price at which he could make the purchase. He further testified that he submitted the offer embraced in the letter to the proper parties, and, with some slight exceptions, it was agreed to; but the appellees refused to accept the property and pay the purchase price.

The court submitted the following special issues, which were raised by the pleadings of the appellees and the testimony adduced by them upon the trial:

"(1) Did the defendants waive the provision in this offer calling for oak timber? Answer: No.

"(2) Did the plaintiff make an arrangement to protect the defendants from the payment of the taxes? Answer: No."       .

Interrogatory No. 3 was not answered because immaterial.

"(4) Did the plaintiff, Stone, inform any of the defendants that the Alexander Gilmer Lumber Company objected to the defendants going on the land to estimate the timber until the trade had been consummated? Answer: Yes.

"(5) When Waterman signed the offer to purchase on October 30, 1920, did O. M. Stone receive information that Waterman was signing on condition that his associates in Dallas would go in with him? Answer: Yes.

"(6) When the agreement was made between the parties on December 8, 1920, did Stone receive information that Waterman was making that agreement on condition that his Dallas associates would go in with him? Answer: Yes.

"(7) Was there a shortage in the timber when actually cut from that as specified in the inventory upon ,which the proposal of October 30, 1920, was based; and, if so, approximately how much? Answer: 100,000,000 feet."

In this appeal it is contended that the court framed the special issues upon the assumption that Stone was the seller of the property, and not the agent of the appellees to make the purchase. He requested the submission of the following issue:

"Did or did not the defendants Ingham, Waterman, and Few employ the plaintiff O. M. Stone to buy for them the capital stock of the Alexander Gilmer Lumber Company, said capital stock to carry with it all of the physical properties of said company?"

The refusal of the court to submit that interrogatory is the principal error, though not the only one, presented in this appeal.

Stone pleaded that he had been employed by the appellees to purchase the property of the Alexander Gilmer Lumber Company for them. He was to receive as his compensation the difference between what he had to pay and the sum of $3,250,000. He also pleaded that he secured from the owners of the property an agreement to sell for $3,000,-000, upon the terms stated in the letter of October 30th, but that the appellees had refused to perform their contract and accept the property upon these terms. The substance of his pleading is that he had earned the compensation contracted for by doing all that he had obligated himself to do to bring about a transfer of the title to the property; and the failure to complete the transaction was due to the arbitrary refusal of the appellees to perform their part of the agreement.

Stone testified in a general way that he was employed by the appellees as their agent to make the purchase. However, he did not state any facts that would indicate an employment different from that implied in the letter of October 30th. It is apparently conceded by all parties that this letter embraced the exact terms and conditions upon which the appellees were to take the property from Stone. A slight modification, which is of no importance here, was made later. As to how he was to get the title from the company, Stone said:

"I was to take the stock certificates from the owners of the Alexander Gilmer Lumber Company, and dissolve the corporation and turn the assets over to these people (appellees), free of any taxes of any kind. There would have been no taxes due as income tax, by reason of the dissolution. If there had been, I was to pay the taxes."

[1] It appears that, whether Stone was to act as the agent of the appellees, or was to purchase the stock for himself, and then sell the property to the appellees at a profit, his right to the compensation here claimed was contingent upon his securing a sale from the owners upon the terms stated in the letter. According to the findings of the jury, that was not done. The jury also found that there was a considerable shortage in the timber, as compared to the inventory upon which the appellees relied in making the offer embraced in the letter above referred to. If the findings of the jury are supported by the evidence, and we think they are, the refusal of the court to submit the question of agency is of no importance.

[2] Stone testified that the provision in the letter calling for the privilege of cutting oak timber for ties was rejected by Filson, who represented the stockholders in the negotiations, but that Filson did agree that they might use a corresponding amount of pine timber. He said he reported that refusal and offer of substituting pine for oak, and it was agreed to by the appellees. This, however, was denied by them. Objection is made to the form in which that issue was framed. A special interrogatory was requested, which used language somewhat different. While we think the language of the requested charge is somewhat more specific, the jury evidently could not have been misled by the phraseology of the issue as submitted.

[3] The evidence showed that the price at which the property was to be sold was such that an income tax would be due the government, and appellees apprehended that this tax would become a charge against the property in their hands. It was for that reason they stipulated that "you (Stone) are to warrant immunity from tax claims up to the date of the transfer of the property." Stone was to buy the shares of stock, dissolve the corporation, and then sell the property belonging to the corporation to the appellees. It is undisputed that the protection called for was not furnished by Stone, nor was there any offer to furnish it. He sought to justify that failure by proving the well-known solvency of the owners of the property, and their ability to pay all charges for which they might become responsible. But that is not what the appellees had contracted for, and they had a right to demand a compliance with the stipulations as written. The language of the contract was that of Stone himself, and he must be held to what it plainly imports.

Waterman testified that he signed the letter of October 30th with the understanding that some business associates residing in Dallas were to be interested with him; that his obligation was to be subject to their approval; and that Stone was notified of that condition at the time the contract was made. He also testified that later the Dallas parties refused to agree to the purchase of the property, because of general financial and trade conditions. That is the reason he gave in a letter to Stone for refusing to accept the property. He testified, however, that his refusal was also based upon Stone's failure to secure the terms which had been agreed upon in the original contract.

The jury found that Stone "had information" of those conditions, and the court probably concluded that such information or notice was sufficient to relieve Waterman from liability.

We think it unnecessary to discuss other defenses urged by the appellees and relied on to support the judgment rendered, or the remaining assignments of error.

The judgment will be affirmed.